DETERMINED IN THE

# THIRD DEPARTMENT

AT

# GENERAL TERM.

## September, 1891.

---

HUDSON RIVER TELEPHONE COMPANY, APPELLANT, *v.*
THE WATERVLIET TURNPIKE AND RAILROAD
COMPANY, RESPONDENT.

*Electric companies — interference of currents used, respectively, by a telephone and by*
*a street railroad company — the trespassing company must adopt another system —*
*the least hurtful system must be employed — the method of operating a road employed*
*by a private corporation is subject to review — priority in time gives the better*
*equity — injunction.*

In an action brought by a telephone company to restrain a street railroad company
from using the single-trolley electrical system to move its cars, it appeared that
the telephone company was incorporated in 1883, and then began business in the
city of Albany, in the transaction of which it discharged the electric current from
its wires into the earth, which was thus used to complete its electrical circuits;
that the defendant, incorporated in 1828 as a turnpike company, in 1862 was
authorized by the legislature to lay railroad tracks in said city, and to operate
its road by any power except steam; that, in 1889, the common council of said
city authorized it to propel its cars by electricity, and that it adopted for that
purpose the single-trolley system; that the electric current used by the plaintiff
was weak, while that used by the defendant was necessarily quite powerful;
that the wires of the two companies ran for a considerable portion of Broadway
in said city substantially parallel; that both companies were legally in the enjoy-
ment of such portion of Broadway; that the more powerful current of the
defendant escaped in large quantities, and passing through the earth and other
good conductors affected the operation of plaintiff's lines, causing trouble with
its switch-board located on private property, and also making it difficult for
customers of plaintiff to hear because of loud noises incident to the passage of a

motor in the vicinity of the plaintiff's wires; that the method of propulsion adopted by the defendant was in common use in this country, and was the most efficient and economical known; that the difficulties of the situation, so far as the interference of the currents was concerned, could be entirely avoided by either company — by the plaintiff, by using a complete metallic circuit, and by the defendant, by substituting the double-trolley or storage-battery systems; that it would be much more expensive for the plaintiff to make such change than for the defendant to adopt the double-trolley system.

*Held,* that the action could be maintained.

That both parties were equally in lawful occupation of the street.

That the grant to the defendant, by the act of 1862, authorized it to use electricity as a motive power, and that such use by it was legal.

That as such power had proved to be one incapable of complete control, and as injury had resulted from its use, the grant to the defendant must be construed in such wise as not to authorize one corporation to invade or destroy the property of another without condemnation thereof or compensation therefor.

That the rule that a party must so use his own property as not to injure that of another applied to this case.

That the exceptions to said rule were predicated upon cases where the damage was too remote, and did not apply where, as here, the damage was direct.

That the consent of the State or a municipality did not affect the question where a cause of action was based, not upon the unlawfulness of an act done in a public street, but upon the wrongful or negligent manner in which it was done.

That, as it appeared that the injury to the plaintiff could be obviated by the use of the double trolley system, a judgment enjoining the defendant's use of the single-trolley system, would not deprive the latter of its franchise to use electricity as a motive power.

That where the legislature has made a grant authorizing a business, and two or more ways exist, by which it can be carried on, one injurious to the rights of others, the other not so, equity will enjoin the use of that mode of operating it which is harmful to others.

That where the legislature has not directed the method or system to be used by a private corporation in the enjoyment of a franchise, the method is not left wholly to the latter's discretion; and if the method adopted be hurtful to others, the selection is subject to review by the courts.

That, although the referee found that the system of defendant was the most efficient and economical, the defendant would not be permitted by equity to employ it to the injury of plaintiff, particularly if such injury could be remedied by the defendant at less expense than the cost of changing the plaintiff's system.

That, assuming both parties to stand equal at law, the plaintiff having begun the use of electricity six years earlier than the defendant, had the better equity by priority of time.

That where it appears that the detriment to the plaintiff will be continuous and permanent its remedy at law is not adequate, and it is a proper case in which to apply to a court of equity and ask for an injunction.

APPEAL by the plaintiff, the Hudson River Telephone Company, from a judgment, entered in the office of the clerk of Albany county on the 21st day of November, 1890, dismissing its complaint upon the merits, with costs, after a trial before a referee. The action was brought to restrain the defendant from using electricity for the propulsion of its street cars in such a manner as to interfere with and injure the efficiency of the plaintiff's telephone service in the city of Albany. On the trial the referee dismissed the plaintiff's complaint, and on such nonsuit judgment was entered in favor of the defendant, from which the plaintiff appealed to this court.

*D. Cady Herrick,* for the appellant.

*Marcus T. Hun,* for the respondent.

MAYHAM, J.:

In the examination of the questions involved in this appeal it is, perhaps, necessary and proper for this court to inquire whether they have not been substantially settled by the Court of Appeals when the parties were before it on an appeal from the order of the General Term of this department upon the question of the continuance of a temporary injunction granted in this action.

If the Court of Appeals has authoritatively disposed of the plaintiff's right to recover in this action adversely to that right, as is insisted by the learned counsel for the respondent, then it becomes the plain duty of this court to affirm this judgment. If, on the other hand, the merits of this controversy remain undetermined, then it becomes equally the plain duty of this court to examine and decide the same as presented on this appeal. The complaint, among other things, alleged that the plaintiff was a corporation and incorporated in 1883 under and in pursuance of chapter 265 of the Laws of 1848 and the several acts amendatory thereof, and that ever since 1883 the plaintiff, as such corporation, has been, and still is, engaged in carrying on a telephone business in the city of Albany, and furnishing telephonic communication between people at a distance, both in such city and in other cities and towns at long distance, for which the plaintiff charged and received compensation. The process by which this telephone business was carried on by the use of electricity was described in the complaint with great minuteness.

The complaint also alleged that the defendant was a corporation duly incorporated under the laws of New York as a turnpike company under and by virtue of chapter 141 of the Laws of 1828, and thereafter, and pursuant to and by virtue of chapter 233 of the Laws of 1862, and the consent and permission of the common council of the city of Albany granted in pursuance of such last-mentioned act, constructed a railroad track upon and through Broadway, in said city, from the northerly bound of such city to South Ferry in the same, and thereafter operated such railroad by horse-power until about the month of September, 1889. Section 4 of chapter 233 of the Laws of 1862 authorized the propulsion of cars on defendant's railroad " by the power of horses, animals or any mechanical or other power, or the combination of them which the said company may choose to employ, except the force of steam."

On the 17th of June, 1889, the common council of Albany granted to the defendant the right to propel its cars through the city of Albany on its tracks in Broadway by electricity, and to erect poles and string wires in the streets for that purpose, with certain restrictions and limitations on the exercise of that right contained in the ordinance.

The defendant under the latter grant adapted its tracks to the use of electric cars, and strung its wires and constructed its dynamo, power and other fixtures and appliances for the purpose, and adapted to the propulsion of its cars, upon a system known as the single-trolley system, and was about to, or did, commence the operation of its cars in Broadway in such city, by electricity upon that system, when the plaintiff commenced this action, and alleged in its complaint, and proved by affidavits, that the operation of the defendant's railroad in that manner and upon that system would injure and seriously impair the usefulness and efficiency of its telephonic service, and prayed for an injunction restraining the defendant from operating such road upon that system.

A temporary injunction was obtained and continued by an order of the Special Term during the pendency of this action, from which order an appeal was taken to the General Term, where the same was continued, unless the defendant filed security for any damage which the plaintiff might sustain by reason of the acts of defendant pending the action, in which case the injunction should be dis-

charged. From this order the defendant appealed to the Court of Appeals, where the appeal was dismissed on the ground that the granting of an injunction *pendente lite* was a discretionary order not reviewable by the Court of Appeals (121 N. Y., 397); but in discussing the question and arriving at that conclusion the learned judge who delivered the opinion of the court uses language which, if employed in pronouncing upon this case when properly before that court for determination, would seem to be decisive of the case.

But the learned judge concludes his opinion in a manner which shows that he did not intend to express an opinion upon the merits, and the whole subject seemed to be relegated to the trial court to be disposed of by it and the appellate courts in the usual and orderly method of trials and appeals, and to that end he concludes his opinion as follows:

" But we think we ought not to dispose of the case upon its merits in this proceeding. The questions are new and difficult and courts elsewhere have differed upon them. The trial of the case upon the merits is now proceeding, wherein the facts will be judicially ascertained, and in case an appeal shall be taken upon the final judgment rendered to this court, we shall then be better able than now to determine the ultimate rights of the parties. The present appeal should, therefore, be dismissed."

It is quite apparent, from the above-quoted remarks of the learned judge, that the whole subject in controversy was remitted to the trial court for its determination as an original question, and having been disposed of by it, as such it comes to this court on appeal to be reviewed as any other case coming before this court in which there has been no authoritative determination by the Court of Appeals. The referee finds the organization and incorporation of the plaintiff and defendant substantially as alleged in the complaint; that the plaintiff was incorporated in the month of April, 1883, under and in pursuance of the provisions of chapter 265 of the Laws of 1848, and the several acts amendatory thereof and supplementary thereto, and ever since 1883, as such corporation, it has been and still is, engaged in carrying on the telephone business in the city of Albany, which business consists of furnishing means of communication between people at a distance from each other by the transmission of sound, or the human voice; and that in the transaction of

such business the use of a current of electricity of an extremely minute character is required; and that the instruments necessarily used in utilizing such current are delicate and sensitive in a high degree.

The referee also finds that persons desiring to communicate with each other are placed in communication through a central office, or exchange; and that the plaintiff's central office is located in a building on the west side of Broadway in the city of Albany. The report also shows that the telephone service of the plaintiff is furnished to persons hiring the same for a fixed period at a stipulated price, who are called subscribers; and also to public stations where each use or communication is paid for by any person desiring to use the same, on payment therefor, and that all public and private stations are connected to the central office, or exchange, by a separate wire, which is also connected with a magnetic bell or annunciator at the exchange, and also at the station, or house or office of the subscribers; and that the plaintiff has connecting lines with stations located in the city of Troy, the village of West Troy and various other cities and villages at long distances from the plaintiff's central office, and connected therewith by wire and wires as before described. The referee also finds that the plaintiff has expended many thousand dollars, and now has many thousand dollars invested in its plant and equipments in the city of Albany, and a large number of poles erected on Broadway and elsewhere in Albany, and on its various lines in and outside of such city, and has procured licenses and permits of the owners of buildings to erect poles upon and string wires over and upon their premises, and that plaintiff has subscribers in all parts of the city of Albany who have heretofore been able to communicate, by means of plaintiff's telephone, with West Troy and various other cities and villages.

The referee also finds that the defendant is a corporation duly organized and incorporated under and by virtue of chapter 141 of the Laws of 1828, and chapter 233 of the Laws of 1862, and that by the Law of 1862 the defendant was authorized to maintain one or more railroad tracks through Broadway and North Ferry street, in the city of Albany, with the consent of and under such restrictions as might be imposed by the common council of the city; and

shortly thereafter constructed railroad tracks on the road-bed of its turnpike, from West Troy, through Broadway, in Albany, to South Ferry street, in said city, and operated such railroad by the use of horse-power for the propulsion of its cars.

On the 17th of June, 1889, the defendant obtained permission from the city of Albany to erect iron posts of such form and height as might be approved by the board of contract and apportionment of the city, on both sides of Broadway, between the south line of South Ferry street and the north line of the city * * * and to string and place wires thereon in such manner that power might be communicated by means of electric motors to be placed on the cars of the defendant, and operate its cars through Broadway and North Ferry street by means of electric motors upon the single-trolley system. The referee also found that, under the provisions of chapter 233 of the Laws of 1862, the defendant was authorized to use the power of electricity to operate its railroad; and that prior to the commencement of this action the defendant had fitted its road for operation of electricity and had prepared cars for running on said road adapted to use by electricity, but before it had erected a post or strung a wire it was, through its president, notified by the plaintiff that if it attempted to operate its road by means of electricity upon the system proposed, it would seriously interfere with, if not destroy, the telephone business and service of the plaintiff.

The referee also found that the electricity used by the defendant in the propulsion of its cars is collected or generated by machinery propelled by steam in what is termed the power-house, and that in operating the railroad by electricity the defendant will cause large quantities and powerful currents of electricity to be generated at the power-house, which will pass from the dynamos in the power-house upon and through said trolley wires to points where the trolley wheels come in contact therewith, thence to pass down said trolley, through the conductors to the motors, through the motors to the conductors connected with the running gear of the car, and thence to the rails of defendant's road, and thence in part through the rails and copper-wire connections back to the place of generation; but that a portion of such electricity and electrical currents will escape or pass from the rails, copper wire and copper connection into the

earth, and pass out through the earth, and electrical conductors found therein, such as gas and water pipes, to a considerable distance from the track of defendant's railroad, and thus come upon the wires of the plaintiff's system, the ends of which are inserted in the earth or connected with gas or water pipes, and from them into and upon the telephonic apparatus of the plaintiff.

That whenever the trolley wires of the defendant's road run for any considerable distance parallel, or substantially parallel with the wires of the plaintiff's system, and at short distance therefrom as in the case of said street called Broadway, a current of electricity, by what is termed induction, will be excited or induced upon the parallel lines of the plaintiff's wires by the currents of electricity passing upon such parallel wires of the defendant, and the current of electricity so excited or induced upon the plaintiff's wires will pass into and upon the system and apparatus of the plaintiff. That the stations of the telephone company and subscribers are located upon private property, and that the telephone service is not disturbed by the "conduction" or "leakage" of the railway currents, except when said currents flow upon the private property of either the telephone company or of its subscribers.

That, by reason of the currents of electricity so escaping from the defendant's tracks, and of the currents of electricity so excited and induced upon the plaintiff's parallel wires by coming into or upon the wires and telephonic system and apparatus of the plaintiff, many of the annunciators of the plaintiff's exchange will be caused to drop, to the great interruption and detriment of the plaintiff's business ; and loud noises will be produced in a large portion of plaintiff's telephones by reason whereof the beneficial use of the same will be frequently rendered difficult and unsatisfactory, and at many times impossible, to the great detriment of the plaintiff and its business, and such detriment will be continous, and that, therefore, the plaintiff will have no adequate remedy at law. That by the adoption and use of either what is commonly called the double-trolley system, or what is commonly called the storage-battery system, as the same are described in the evidence, given upon the trial herein, the defendant can obviate all the damage and injury complained of herein by the plaintiff and hereinbefore described.

The adoption and use of either of said systems by the defendant

would necessitate the expenditure of large sums of money for construction, maintenance and operation in excess of those required therefor by the single-trolley system heretofore adopted and used by the defendant and hereinbefore described. That the operation of the defendant's road upon the double-trolley system would be much more liable to accidents and interruptions than upon the single-trolley system.

That the plaintiff by making each of its currents a metallic one, as described in the evidence given upon the trial herein, can obviate all the damage and injury complained of by it, herein and hereinbefore described. That it would cost the plaintiff much more to make each of its currents a complete metallic one as aforesaid than it would cost the defendant to change its system from a single-trolley to a double-trolley one. That it would cost the plaintiff much more to maintain such complete metallic current than it would cost to maintain its currents as now constructed. That the plaintiff can, by adopting and using what is called and known as the McClure device or system, and described in the evidence given at the trial herein, upon a portion of its line, obviate to a considerable extent the effect upon its telephone of the currents coming in and upon its wires as above set forth, but that such effects would to a certain damaging extent continue after the adoption and use of such device or system, and that the adoption thereof would cost the plaintiff several thousand dollars. The referee also found that the current of electricity used by the plaintiff is so slight that it can in no wise affect the defendant, and that the single-trolley system is the only system of electric-railway propulsion that in any degree affects the telephone service, and that the storage-battery system and double-trolley system are now in practical operation in various parts of this country and Europe, and that both of the last-mentioned systems are operated upon and over roads with heavier grades than those upon the defendant's road ; and that there are no curves, turnouts or cross-overs upon the defendant's road to prevent the use of either the storage or double-trolley system, and that the operation of the defendant's railroad, either by the double-trolley or storage-battery system, would prevent any interference on its part with either the plant, equipment or service of the plaintiff. The referee also found that the plaintiff had between fourteen and fifteen hundred

subscribers, and twenty-seven out-of-town lines, constituting the Albany exchange ; and that the central office or exchange of the plaintiff being situate immediately upon the line of defendant's road, any disturbance to such central office or exchange will be communicated to all the lines of the plaintiff ; and that the plaintiff had erected its poles and strung its wires through the streets of the city of Albany, and was using electricity and the earth as a return current therefor, for a number of years before the defendant attempted to make any use of electricity as a propelling force for its cars ; that the first electric railway was built in 1879, and that they have only been in use commercially in this country for the last five or six years.

The referee also found that the only way plaintiff can prevent being interfered with and injured is by making a metallic circuit on all of its lines, and that the plaintiff's present switch-board cannot be used for a metallic-current exchange, and that a new switch-board will cost about twenty thousand dollars, and that to change the plaintiff's exchange from a ground-current exchange to a metallic-current exchange will cost the sum of $120,000, and that the highest estimate of expense in exchanging the defendant's system from a single- to a double-trolley system is the sum of $39,520.

The referee found, as matter of law, that the plaintiff had the right to erect its poles and string its wires through the streets of the city of Albany, and conduct the telephone business by means thereof. The referee also found and decided that, upon the pleadings and proof, the plaintiff has failed to establish a cause of action against the defendant, and that the defendant is entitled to judgment against the plaintiff, dismissing the complaint upon the merits and for costs.

The counsel for the plaintiff excepted to this conclusion of the referee, and also to numerous other conclusions of law as well as to numerous findings and refusals to find by the referee. The facts found by the referee differ widely from those before the Special and General Term of this court and the Court of Appeals, when this case was before the courts on appeal from the order continuing the injunction *pendente lite*. In considering the questions raised on this appeal, I think we must start with the assumption that both the plaintiff and defendant held valid charters and grants from the

State and the municipal authorities of the city of Albany to conduct their respective business in that city. The plaintiff, under the grants and concessions to it, had the right to establish its exchange, set its poles and string its wires in the streets, and over and upon private property when it had acquired that right of the individual owners, either by grant or license, and thus to carry on the business of telephoning; and that the defendant, in like manner, had the right, by legislative grant and municipal ordinance, to lay its tracks in the streets of the city, and to propel its cars over the same by any power authorized in the act of 1862, and thus to operate its railroad.

Starting with this assumption, we must next inquire whether either of these parties may so conduct its own business as to injure or impair the business of the other. And if so, to what extent such injury may be lawfully carried In examining this question, we must endeavor to ascertain what rights the respective parties acquired in the street under their grants, and whether, in any event, the defendant can, without liability, permit currents of electricity, induced by it in the operation of its railroad, to escape upon the private property of the plaintiff to the damage of the same. The grants to both of these corporations of their respective charters for the proper and necessary carrying on of their respective business are for public purposes, and either may, in a proper case, condemn private property (chap. 471, Laws of 1853, § 2 ; *People ex rel. Postal Telegraph Co.* v. *Hudson River Telephone Co.*, 19 Abb. N. C., 466); and each were authorized by law and city ordinance to conduct their business in Broadway in the city of Albany.

While it is true that at the time the defendant, by the act of 1862, acquired the right to lay down rails and operate a railroad in Broadway electricity was unknown as a motive power for railroads, yet this court has held that the authority given by that act embraced electricity. (*Hudson River Telephone Company* v. *Watervliet Turnpike and Railroad Company*, 56 Hun, 67.) I think that within this case it is no longer an open question for the determination of this court as to the right of either of these parties to the exclusive occupancy of the street, by its electric currents, as this court in that case expressly held that "the grant to each company is to employ upon the same street the invisible energies of nature ;

and since it is in vain to define the fields that confine them, we are, perforce, constrained to seek for methods which will neutralize or reduce to a minimum the injurious effect of their contact or interference with each other." While, therefore, the above must be the law of this case as to the street in which both parties have, under the grants, equal immunity, it by no means follows that either party may permit its current, used properly for its own business, to stray upon the private property of the other, to its damage. As we have seen, the referee has expressly found " that the stations of the telephone company and subscribers are located on private property, and that the telephone service is not disturbed by the 'conduction' or 'leakage' of the railway current, except when said current flows upon the private property of either the telephone company or that of the subscribers." If, therefore, we assume that the legislative grant gave the defendant the authority to use, as a motive power for the propulsion of its cars upon the tracks which it was permitted to lay down in Broadway, an energy or power which would pervade the entire street, can it be held that, as an incident of that grant, the defendant could adopt a power which could not be confined to the street, but would spread out upon the private property of abutting owners, to their damage? In answer to this question, we are referred by the learned counsel for the defendant to the rule that grants of franchises to be exercised for the public convenience must be liberally construed for the promotion of their beneficial purpose, and we are referred to 1 Morawetz on Private Corporations (§ 365), where it is laid down as a rule that " there can be no doubt that railroad companies may adopt all improvements in their business which a liberal management and inventive genius can provide." Again, " Doubtless it is to be held that every grant of power is intended to be efficacious and beneficial and to accomplish its declared object, and that it carries with it such incidental powers as are requisite to its exercise." (*Matter of City of Buffalo*, 68 N. Y., 172.)

" Within the limits of a substantial adherence to purpose, the empowering clauses of incorporating instruments should be construed largely and liberally so as not to defeat the purpose by a too narrow restriction of the means." (*Mayor of Norwich* v. *Norfolk Railway*, 4 El. & Bl., 433.) While these rules above referred to and quoted are doubtless sound and should govern in a proper case, we fail to see

their application to this question. It cannot, we think, be claimed that the application of these principles will authorize such a construction to be placed upon a legislative grant as to authorize one corporation to invade the private property of another and destroy or appropriate it without condemnation and compensation. The sound and just elementary rule still prevails, that a party must so use his own property as not to injure his neighbor. It is true that exceptions to this rule may exist in certain cases when the act done is in the lawful and reasonable use of one's own property and when the damages to another are so remote as not to be readily traceable as the consequence of the act complained of. (*Cogswell* v. *N. Y., N. H. and H. R. R. Co.*, 103 N. Y., 18.) This rule is not changed by any right or authority conferred upon the defendant by the act of 1862, or the authority conferred on it by the municipality to use electricity as a motive power. The authority thus conferred must be deemed limited within the rules of law by which the rights of owners of abutting property are protected in the use and enjoyment of their property.

The consent of the State or the municipality to the doing of an act in a public street does not vary the rights and liabilities of the parties in respect to the cause of action, when it is based on the wrongful or negligent manner in which the act was done and not upon its unlawfulness. (*Village of Port Jervis* v. *First National Bank*, 96 N. Y., 556; *Mairs et al.* v. *Manhattan Real Estate Association*, 89 id., 503.) " Consent by a municipal corporation to a person to do a lawful act merely permits it to be done in a careful, prudent and lawful manner, and when performed in any other manner, and injury to a third person ensues, the author of the injury is liable therefor. Upon receiving a license from the body authorized to grant it  *  *  *  the licensee impliedly agrees to perform the act in such a manner as to save the public from danger and the municipality from liability." (*Village of Port Jervis* v. *First National Bank*, 96 N. Y., *supra*, and cases there cited.) The authority conferred by the legislature in this case was to propel their cars by " the power of horses, animals or any mechanical or other power, or the combination of them which the said company may choose to employ excepting the force of steam." The language of the act of the legislature conferring this grant or franchise is similar

to that under consideration by the Court of Appeals in *Cogswell* v. *New York, New Haven and Hartford Railroad Company* (103 N. Y., 10)ᵢ Under the authority conferred by the legislature to operate a railroad, the defendant erected its engine-house and located its coal yard in close proximity to the plaintiff's dwelling, so that the smoke, gas and dust seriously affected the comfort and health of the occupants of the house. In an action for damages, by the owner of the house against the railroad company, the defense was the legislative grant of authority and that the defendant had not abused or exceeded the authority given. The trial court found " that whatever damage has resulted to the plaintiff or her property by reason of the defendant's use and occupancy of its engine-house and coal bins is *damnum absque injuria*."

The Court of Appeals reversed the judgment of the trial court in this case, and in the discussion of the power of the legislature recognized that in some instances the legislature may subject private property rights to inconvenience or loss for the promotion of the public good, but in laying down that rule the court uses this quali_ fying language. " But the statutory sanction, which will justify an injury to private property, must be express, or must be given by clear and unquestionable implication, from the powers expressly conferred, so that it can fairly be said that the legislature contemplated the doing of the very act which occasioned the injury. This is but an application of the reasonable rule that statutes, in derogation of private rights or which may result in imposing burdens upon private property, must be strictly construed. For it cannot be presumed, from a general grant of authority, that the legislature intended to authorize acts to the injury of third persons where no compensation is provided, except upon conditions of obtaining their consent. This construction of statutory powers applies with peculiar force to grants of corporate powers to private corporations, which are set up as a justification of corporate acts to the detriment of private property." (*Cogswell* v. *N. Y., N. H and H. R. R. Co., supra.*) It will hardly be contended that the legislature, in making the grant to the defendant in 1862, contemplated the use of motive power by the defendant in running their railroad, which would not only pervade the whole of Broadway, but would extend

beyond the limits of that thoroughfare and drive out of use, on private property, industries lawfully and properly established there, without the consent of the owner; but simply by the exercise of superior and irresistible force. Unless the legislature did contemplate such a result and provide for it in the act, the defendants, under the legislative grant, acquired no right thus to injure and destroy the plaintiff's property or impair its use, especially on its own premises. This would seem to be the clear and inevitable result of the decision of the Court of Appeals in the case last cited. It will be observed in this case that the language in the legislative and municipal grant of authority to the defendant relates only to the power to be used by it, and specifies no particular mode of its application.

If the single-trolley system was the only method of applying electricity as a motive power to cars, then the authority to use electricity might be said to contain an authority for the use of that system notwithstanding its injurious effect upon others, provided the legislature has the constitutional power to grant a right to a corporation to invade private rights or destroy the property of other corporations or individual. But as the case discloses that the single-trolley system is not the only method of applying electricity as a motive power for the propulsion of railroad cars, we are not called upon to examine that constitutional question. The referee having found that all injury to the plaintiff's business and property can be obviated by the adoption of the double-trolley system or storage-battery system, it follows that enjoining the use of the single-trolley system would not deprive the defendant of the use of electricity as its motive power, but leave it in the beneficial enjoyment of the grant by the legislature and of the ordinance of the common council, neither of which confine the grant of the use of electricity to the single-trolley system. The defendant, having it in its power to avail itself of the use of electricity, conferred by the statute and ordinance, in a manner in which the rights of the plaintiff would not be affected injuriously, cannot be permitted to justify an injury to the plaintiff under such statute and ordinance.

In the case of *Hill* v. *Managers of Metropolitan Asylum District* (L. R., 4 Q. B. Div., 433), the act of parliament authorized the erection of an asylum for infirm and insane paupers in the Metropolitan Asylum District in London, to be designated by the

Poor Law Board, and authorized the purchase and leasing and fitting up a building for that purpose.

· The act referred to small-pox patients as among the class of persons to be provided for. Under this act the managers erected a hospital in close proximity to the plaintiff's house, which the jury declared a nuisance, no precise definite site was fixed by the act· of Parliament, except a general designation of the Metropolitan Asylum District in London. The commissioners might have selected a site which would not have injured the plaintiff. The defendant sought to justify under the act. But it was held that the statutory sanction sufficient to justify the commission of a nuisance must be· expressed; that the particular land or site for the hospital must have been defined in the act; that it·must appear by the act, while defining certain general limits, that it could not be complied with at all without creating the·nuisance. Lord WATSON, when this case came up on appeal (L. R., 6 App. Cas., 213), used this language: " If the order of the legislature can be implemented without nuisance, they cannot, in my opinion, plead the protection of the statute; and, on the other hand, it is insufficient for their protection, that what is contemplated by the statute cannot be done without nuisance, unless they· are also able to show that the legislature has directed it to be done. Where the terms of the statute are not imperative, but permissive, when it is left to the discretion of the persons empowered to determine whether the general powers committed to them shall be put in execution or not, I think the fair inference is that the legisla-· ture intended that discretion to be exercised in strict conformity with private rights, and did not intend to confer license to commit nuisance in any place which might be selected for that· purpose."

The reasoning and conclusion of the Court of Queen's Bench in· the above case was adopted and fully acquiesced in by the Court· of Appeals in the case of *Cogswell* v. *New York, New Haven and Hartford Railroad Company* (103 N. Y., *supra*). The rule, there- fore, seems settled and of universal application that when a grant· is given by the legislature to conduct a business in the conduct of which two or more ways exist, and by one of which the rights· of others will be injuriously affected, and by the adoption of the other methods other parties will not be injured, a court of equity

will interfere and enjoin the use of the mode by which the rights of others will be injuriously affected.

We are cited to numerous cases by the learned counsel for the defendant, where it is held that injuries remote and consequential must be submitted to by the citizen in the march of public improvements, and that the injury in such cases is *damnum absque injuria*, such as building docks in navigable rivers, cutting down on the line of abutting premises in excavating for public streets, and the like; but I have found no case like this, where the injury is direct, and not remote, and where the act has not been ordered by the legislature, where the court has refused relief or redress to the party injured. It is also urged by the learned counsel for the defendant that, as the electrical system to be used by the defendant in the propulsion of its cars has not been defined by the legislature, it must be left to the determination of the defendant as to what method or system it will adopt, and that the power of selection is not the subject of review.

The doctrine when applied to public bodies and municipalities is sound and supported by authority. But, I think with private corporations and individuals a different rule obtains, and while they may adopt such devices as they please, so long as their selection does not affect the rights of others, they are bound so to use their own as not to injure others.

An individual may use for his own purposes a powerful, ferocious and dangerous animal, but he must do so at his peril; and if others are injured by such animal, known by the owner to be dangerous, no one would question the liability of the owner.

But it is also said that the defendant had selected the best-known method, and, therefore, cannot be interfered with in its use. It is true that the referee has found that the system of the defendant in the use of electricity as a motive power, is the most efficient and economical system in use. It is equally true that the plaintiff's system of telephoning is shown to be the usual and approved method, and it is not claimed that its use in any way injures the business of the defendant. Assuming, as we must, that each company within their chartered privilege is in the pursuit of laudable and useful business, no reason is perceived why they should not each be accorded the protection guaranteed by law to other business and pursuits, and in

like manner be subject to the duties and obligations imposed by law. Wood, in his Law of Nuisances, defines such rights and obligations as follows: "Every person who, for his own profit or advantage, brings upon his premises and collects and keeps there, anything which, if it escapes, will do damage to another (subject to some exceptions rendered necessary for the protection of industrial interests), is liable for all the consequences of his acts, and is bound at his peril to confine it and keep it upon his own premises." (Wood's Law of Nuisances, § 111, p. 115.) We see no reason why this principle is not applicable to the parties in this action. As we have seen from the report of the referee, no injury occurs to the plaintiff until the electricity generated or produced by the defendant invades the plaintiff's premises, in violation of the above principle. But it is, doubtless, the duty of the court, in the exercise of its equitable power, to protect, as far as practical within legal rules, both these great modern improvements; and, as has been intimated by this court and the Court of Appeals when this case was before it on a motion, if practicable, save both of them to the public use, upon just and equitable principles and at the least possible expense and burden to the parties. On that motion it was assumed that the telephone could change its system from a ground current to a metallic current at less expense than the defendant could change from a single to a double-trolley system. The trial of the action and the report of the referee now demonstrates that the expense of changing to a metallic current by the plaintiff would be over $120,000, while that of changing from the single to the double-trolley system would be but about $33,000. Thus it appears that, in the light of economical expenditure of money, the defendant can obviate the difficulty complained of at much less expense than the same can be done by a change of plaintiff's system.

Again, it is worthy of consideration that the plaintiff established its plant and prosecuted its business for some years before the use of electricity was known as a motive power for railroads; and while this court has held that the right of the defendant to use electricity was given by the act of 1862, it could not have been anticipated by the plaintiff at the time it established its plant and commenced its business that it could be interfered with by any power which the defendant, by that act, could employ as a motive

power. But if we assume, as we must, that the act of 1862 and the act under which the plaintiff was incorporated, gave to these parties equal equity, still the employment of the plaintiff's capital in the establishment of its business, long before either the plaintiff or defendant knew of the defendant's right to use electricity, would seem to give the plaintiff a superior equity. In Pomeroy's Equitable Jurisprudence (§ 114), the rule is laid down as between parties having only equitable interests, if their equities are in all respects exactly equal, priority of time will give the better equity.

Having reached a conclusion that the defendant is not protected by its grant from the State or the city against the consequences of allowing its currents to flow upon the private property of the plaintiff, and that of its fixtures upon the premises and property of its patrons, to the injury of the plaintiff and its business, and that the injury complained of is not *damnum absque injuria*, the remaining question is, is this a proper case for equitable relief by way of injunction; or has the plaintiff a complete and adequate remedy at law? The referee finds, and the evidence clearly establishes, that the injury complained of is continuous and permanent; that by reason of the currents of electricity so escaping from the defendant's tracks, etc., and of the currents of electricity so excited or induced upon the plaintiff's parallel wires by the parallel wires of the defendant coming into or upon the wires of the telephone system and apparatus of the plaintiff, many of the annunciators of the plaintiff's exchange will be caused to drop, to the great interruption and detriment of the plaintiff's business, and loud noises will be produced in a large proportion of the plaintiff's telephones, by reason whereof the beneficial use of the same will be frequently rendered difficult and unsatisfactory and at many times impossible, to the great detriment of the plaintiff and its business, and that such detriment will be continuous, and that, therefore, the plaintiff will have no adequate remedy at law. It would seem to follow that the only available remedy open to the plaintiff to prevent a continuance of the injury to its property is an appeal to the equitable power of the court to restrain the defendant from a continuation of the injury, and that an injunction is the proper remedy.

We think, therefore, that the conclusions of law of the learned

referee are not in harmony with the facts found, and that the dismissal of the complaint was error, for which judgment should be reversed.

LANDON, J., concurred.

LEARNED, P. J.:

I concur with the foregoing opinion. It seems to me that this case has been practically decided by the Court of Appeals.

It was held by that court, in *McHenry* v. *Jewett* (90 N. Y., 58), that if, in any case, the complaint showed no cause of action, then, on an appeal to that court from an order affirming an injunction order *pendente lite*, a question of law arose; that that court ought to decide that question and ought to reverse the order. The same rule is laid down in *Williams* v. *Western Union Telegraph Company* (93 N. Y., 640), and again in the present case in 121 New York, 397. When in the present case the appeal from the order affirming the injunction was decided, two of the judges were of the opinion that the complaint showed no cause of action, and, therefore, must have been in favor of reversing the order appealed from. But the other judges of the court held otherwise, and dismissed the appeal, holding that the complaint did state facts showing a cause of action, and, therefore, that the question of granting an injunction *pendente lite* was one of discretion in this court.

The allegations of fact were clearly stated in the complaint, and there could be no uncertainty as to the positions taken by parties. The questions argued in this court, and necessarily in the Court of Appeals, were largely as to the right of the plaintiff to enjoy its alleged franchise and business without the interference which was alleged to arise from the franchise and business of the defendant in the manner stated. Unless the plaintiff had such rights on the facts alleged in the complaint, then, of course, it could not maintain the action, and the Court of Appeals would have reversed the order which affirmed the injunction *pendente lite*.

It is true that the opinion of the court speaks of " grave doubts " whether, on the facts stated in the complaint, any cause of action existed. This language is probably used in compliment to the two judges who disagreed with the majority opinion. Undoubtedly, too, the defendant had " grave doubts " on this point, and for a settle-

ment of these doubts appealed to that court. But there could be no longer any doubt on the subject when that court decided to dismiss the appeal. For its decisions make the law in this State, and, therefore, it cannot say that it dismissed the appeal, because it did not know whether the complaint stated a cause of action or not. It was the right of the defendant to have a reversal, as matter of law, if no cause of action was set forth in the complaint; and when that court dismissed that appeal it decided that the complaint stated a good cause of action.

Something is said in the opinion as to the trial being then in progress, and as to the facts which thus might be judicially ascertained; and, of course, if the trial should not have established the facts alleged in the complaint, then that decision of the Court of Appeals would be inapplicable. But we are not to suppose that that decision was merely a temporary expedient, or that the court would cause parties the labor and expense of trying a cause in which the complaint alleged no good cause of action, when the question was directly before the court whether or not the complaint did contain such good cause of action.

It did not need a trial of the issues to determine whether, on the facts stated in the complaint, a cause of action existed. If on these facts a cause of action did not exist, the court would have reversed the order. If it did, the court would have dismissed the appeal, as was, in fact, done. To suppose that the court did not know whether a cause of action existed or not on the facts stated would be disrespectful. We cannot believe that when this case shall finally come before that court it will hold any differently from its decision above cited, viz., that the complaint states a good cause of action.

The referee's report sustains the allegations of the complaint, and establishes facts more favorable to the plaintiff than those which were proved on the hearing upon the motion for an injunction, as is shown in the preceding opinion by my Brother MAYHAM. His conclusion, therefore, necessarily follows from the decision of the Court of Appeals above referred to.

Judgment reversed, referee discharged, new trial granted, costs to abide event.